CIRINO MICELI, APPELLEE, V. EQUITABLE LIFE ASSURANCE SOCIETY, APPELLANT.

293 N. W. 112

FILED JUNE 28, 1940. NO. 30770.

*Brown, Fitch & West,* for appellant.

*Wear, Boland & Nye* and *Robert E. McCormack,* contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

JOHNSEN, J.

Plaintiff recovered a judgment for $1,550.24, on a group insurance policy, with a total and permanent disability provision, issued by defendant upon the lives of the employees of the American Smelting & Refining Company. The court also allowed an attorney's fee of $350. Defendant has appealed.

The errors alleged are (1) the denial of defendant's motion for a directed verdict on the ground that plaintiff was not totally and permanently disabled at the time his insur-

ance coverage ceased; (2) the refusal to give certain instructions tendered by defendant; (3) the giving of a particular instruction on the trial court's own motion; and (4) the excessiveness of the attorney's fee allowance.

Defendant's principal contention is that the evidence was insufficient to establish total and permanent disability on the part of plaintiff, within the meaning of the policy, and that its motion for a directed verdict should therefore have been sustained. The disability provision of the policy is as follows: "If proof shall be furnished the Society that any employee insured under this policy has, before having attained the age of 60, become wholly disabled by bodily injuries or disease, and will be wholly and presumably permanently prevented thereby for life from pursuing any and all gainful occupation, the Society will pay six months after receipt of such proof * * * the full amount of the insurance on such life." The policy further provided that the insurance as to any employee should automatically cease upon the termination of his employment.

The evidence shows that the smelting company dropped plaintiff as an employee of its Omaha plant on April 5, 1932. He was actually laid off on March 31, 1932, when the plant was being temporarily shut down. During the twenty-five years that he had worked at the smelter, there had been other temporary shut-downs, but each time he had been called back to work, in his turn, when the plant was reopened. On this occasion, the plant reopened about a month after the shut-down, but, while other employees, younger in service than plaintiff, were returned to work, he was told that they had nothing that they could give him to do.

He contends that the reason his employment was permanently terminated was that, because of arthritis and lead poisoning, he was no longer fit to do the kind of work which the plant required and in which he had for so many years been engaged. It appears that, until 1931, he had worked at heavy manual labor, in what was called the "kettle gang." That year he was shifted to lighter work, such as unloading automobile battery plates, where he was placed on a piece

work basis. He claims that, even at this lighter work, he was unable to keep up his end with the other men, and that he frequently was obliged, during working hours, to go home and go to bed. The only employment he had ever known, from the time he immigrated to this country, was at the smelter, and when he saw that the plant had re-opened, he says that he sought to get the personnel officer to allow him to come back and to give him some light work to do, such as distributing towels about the plant.

There is evidence that plaintiff, for a number of years, had been suffering from progressive arthritis, and also some indications that he had chronic lead poisoning. The smelter's dispensary records show that for several years he had been carrying a blue line on his gums. In 1927 an assistant personnel man and safety director had made a notation in the dispensary records that, in view of his lead absorption, plaintiff was a bad plant risk and should be released. In 1928 he had made another notation, suggesting that plaintiff should be released because of a pronounced case of lead poisoning. In 1931 there was a further notation that plaintiff ought to be gotten rid of as soon as it was conveniently possible. It appeared also that plaintiff had been troubled with constipation for a long time, and was suffering abdominal pains, and that he had pains in his legs and arms on motion, all of which were shown to be symptoms of lead poisoning. As early as 1927, he had begun to develop arthritis, which had grown progressively worse, with calcium deposits throughout the joints of the hands, and, in 1932, the physician of the smelter had been giving him repeated injections, for a period of ten to twelve weeks, prior to the termination of his employment.

From the testimony of plaintiff, his wife, and his daughter, it appeared that in 1931 the arthritis had progressed to the point where the knuckles and the other joints in his hands were hard and swollen, and where he had constant pains in his hands, arms and shoulders. He was unable to close his hands, on attempting to grip. The movements of his legs were affected. He vomited and had dizzy spells,

and would come home from the plant at times, during working hours, and would go to bed. A medical expert, whom he employed to examine him in July, 1932, said that he had multiple arthritis to the degree that he was totally and permanently disabled from doing any work, and that such disability, in his opinion, had existed for at least six to twelve months prior to his examination. This doctor further testified that, in whatever attempts plaintiff had made to do manual labor at the plant that spring, "he was overstepping his distance, he was too ambitious to hold his job probably. A lot of times a working man like that might carry on." One of the assistant personnel men of the smelter, whose connection, however, had since been severed, declared that, in 1931, although plaintiff was kept on the pay roll, he was not actually able to do his share of the work. There was testimony also that he had not done and was not able to do any work since his release by the smelter.

There was evidence, of course, on the part of defendant, controverting the testimony as to plaintiff's physical condition and his total disability, which it is unnecessary to detail. The testimony of plaintiff's witnesses, if believed, was such that the jury could properly find that, from 1931, until his employment was terminated, and thereafter, he was unable physically to do the kind of work that had been his sole occupation for approximately twenty-four years; that, because of his condition, the smelter had given him some lighter work for a year or so before he was dropped from the pay roll; that, even this lighter work, he had been unable to carry on satisfactorily, and that he could not hold up his end with the other men; and that, on April 5, 1932, and all times subsequent thereto, he was so disabled by disease that he could not do the essential tasks of a laborer, which was the only occupation for which he was fitted. This was all that was required to create a liability upon the policy.

We have repeatedly held, though in varying language, that a liability will be held to exist under a total and permanent disability provision in an insurance policy, where

there is a disability that renders the insured unable to perform the substantial and material acts of his vocation in the necessary manner. *McCleneghan v. London Guarantee & Accident Co.*, 132 Neb. 131, 271 N. W. 276; *Woods v. Central States Life Ins. Co.*, 132 Neb. 261, 271 N. W. 850; *From v. General American Life Ins. Co.*, 132 Neb. 731, 273 N. W. 36; *Bennett v. Metropolitan Life Ins. Co.*, 136 Neb. 785, 287 N. W. 609; and other cases. In *Hamblin v. Equitable Life Assurance Society*, 124 Neb. 841, 248 N. W. 397, which involved a substantially similar group policy, also issued by the present defendant, it was said: "The term 'total disability' is rarely, if ever, given a strictly literal meaning of absolute helplessness or entire physical disability, but rather inability to do substantially, or practically, all material acts for the transaction of insured's business." In *Schultz v. John Hancock Mutual Life Ins. Co.*, 134 Neb. 885, 280 N. W. 165, recovery was allowed upon a group policy, insuring a meat salesman as, and while he remained, an employee of Armour & Company, although he had been discharged by Armour & Company, and had thereafter worked as a salesman for another packing firm, where the evidence showed that, before he was discharged by Armour & Company, he was suffering from leukemia, which made it necessary for him to come home occasionally during the day and rest for a time before continuing his work. If an insured's ability to do substantially and practically any of the material acts necessary for the transaction of his usual business or vocation is affected, or if, while attempting to do all of such acts, he is jeopardizing his health and safety, or ought not actually to be so engaged, he will be held to be totally disabled within the meaning of a disability provision in an insurance policy. The courts will not in such a situation penalize one who heroically attempts to carry on, if he is not actually able to do so, or if he ought not soundly to be making the attempt. *Rathbun v. Globe Indemnity Co.*, 107 Neb. 18, 184 N. W. 903. The trial court properly overruled defendant's motion for a directed verdict in this case.

The principal complaint made as to the refusal of the trial court to give instructions tendered by defendant relates to the question of the furnishing of proof of plaintiff's disability. The policy provided for payment of disability benefits, "If proof shall be furnished the Society that any employee * * * has * * * become wholly disabled by bodily injuries or disease." There is no requirement for a preliminary notice and no specific limitation as to the time within which proof of disability must be furnished. Defendant claimed that no notice or proof of disability had been furnished it prior to the institution of this suit. Plaintiff alleged that defendant had expressly denied liability on the ground that he was not totally disabled, and that it thereby had waived any provision in the policy that required the furnishing of formal proof. His evidence showed that, shortly after the termination of his employment, his wife and daughter had gone to the branch office which defendant maintained in Omaha, to inform defendant of plaintiff's disability and to make claim upon the policy, and that one of defendant's representatives, after taking the certificate into another office, returned and declared that plaintiff was not disabled, and accordingly denied liability upon the policy. The rule is well settled that a denial of liability for a particular risk, loss, or disability, under a policy of insurance, is a waiver of the right to insist upon a requirement in the policy for the furnishing of formal proof thereof. *Serven v. Metropolitan Life Ins. Co.*, 132 Neb. 637, 272 N. W. 922; *Ericson v. Mutual Benefit Health & Accident Co.*, 122 Neb. 580, 241 N. W. 273.

Instructions No. VIII and No. IX requested by defendant, on the question of notice, claim, and denial of liability, were adequately covered in instruction No. IV, given by the court on its own motion. Indeed, had the jury returned a verdict against plaintiff, he might possibly have claimed that the instruction given was less favorable to him than he was entitled, in that it was not explicit on the issue of waiver. As to instructions Nos. XIV, XVI, and XVIII tendered by defendant on the question of total disability, de-

fendant has not assigned as error the giving of instruction No. X in which the trial court attempted to define the term total disability, and in the absence of any claimed error therein, that definition was adequate. A judgment will not ordinarily be reversed for refusing to give tendered instructions, where other instructions given by the court fairly and correctly cover the issues involved in the tendered instructions. *Campbell v. Slater*, 127 Neb. 231, 254 N. W. 897.

The giving of instruction No. XIII by the trial court is assigned as error, but the assignment is not further specifically discussed. In the absence of such discussion, where no error is readily apparent on the face of the instruction, the assignment will not be further reviewed.

It is claimed that the attorney's fee allowance of $350 was excessive. There is some indication that the case has been tried twice in the district court. But, however that may be, the transcript does not show that the question ever was presented to the trial court for reconsideration. Any error in taxing an attorney's fee or in the amount allowed must first be presented to the district court for correction, before it will be reviewed on appeal. *From v. General American Life Ins. Co., supra.*

The judgment of the district court is affirmed and an additional attorney's fee of $100 will be taxed as costs in this court.

AFFIRMED.

The following opinion on motion for rehearing was filed November 16, 1940.

*Brown, Fitch & West,* for appellant.

*Wear, Boland & Nye* and *Robert E. McCormack, contra.*

*Kennedy, Holland, De Lacy & Svoboda, amici curiæ.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

JOHNSEN, J.

Our previous opinion in this case, reported *ante,* p. 367, 293 N. W. 112, declares that, "If an insured's ability to do substantially and practically any of the material acts necessary for the transaction of his usual business or vocation is affected * * * he will be held to be totally disabled within the meaning of a disability provision in an insurance policy."

On motion for rehearing, it is argued that this statement of the rule is in conflict with *Hamblin v. Equitable Life Assurance Society,* 124 Neb. 841, 248 N. W. 397, *McCleneghan v. London Guarantee & Accident Co.,* 132 Neb. 131, 271 N. W. 276, and *Woods v. Central States Life Ins. Co.,* 132 Neb. 261, 271 N. W. 850. The *Hamblin* case holds that "Total disability, preventing the insured from pursuing a gainful occupation, exists when the injured party is unable to perform the substantial duties of a given occupation." In the *McCleneghan* case we held that total disability, in insurance law, is "such a disability as renders insured unable to perform the substantial and material acts of his business or occupation in the usual way." The *Woods* case declares that total disability, under a policy of insurance, "means inability to do all the substantial and material acts necessary to the prosecution of the insured's business or occupation in his customary and usual manner."

The statement of the rule in our opinion in this case is in no way a departure from these previous expressions. Inability to do any act necessary for the transaction of the insured's usual business or vocation, which prevents the substantial and practical conduct or pursuit of such business or vocation, is, to us, inability to "perform the substantial duties of a given occupation," or "to perform the substan-

tial and material acts of his business or occupation in the usual way," or "to do all the substantial and material acts necessary to the prosecution of the insured's business or occupation in his customary and usual manner." It is not important how many individual acts—whether one or several —the insured is prevented from performing, but whether the thing or things which he is unable to do keep him from substantially and practically conducting or pursuing his previous business or vocation. If his ability to perform any such act or acts is thus impaired, then he is unable to do all the substantial and material acts necessary to the prosecution of his business or occupation in his customary and usual manner.

OPINION ADHERED TO AND REHEARING DENIED.