CHARLES L. GOWE, GUARDIAN, APPELLANT, V. MUTUAL LIFE
INSURANCE COMPANY OF NEW YORK, APPELLEE.

296 N. W. 163

FILED FEBRUARY 4, 1941.   No. 30869.

*Clinton Brome,* for appellant.

*Brown, Fitch & West, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE and
MESSMORE, JJ., and HASTINGS and KROGER, District Judges.

PAINE, J.

This is an action by the plaintiff as guardian of Catherine
G. Bewsher, incompetent, to recover a judgment against

defendant and appellee in the sum of $1,200 with interest and attorney's fees. Trial was had to a jury, and at the conclusion of all the evidence the court sustained a motion for a directed verdict, discharged the jury, and entered judgment for the defendant, from which judgment plaintiff appeals.

In the petition Charles L. Gowe alleged that he was the duly appointed guardian of Catherine G. Bewsher, an incompetent; that on March 4, 1919, the defendant company issued to the plaintiff's ward, Catherine G. Bewsher, under her maiden name of Catherine E. "Gow," a policy of insurance, No. 2585882, in the sum of $2,000. It is further alleged that she paid all the premiums due on said policy up to and including the date of her disability, and that the policy provided that if she should, before attaining the age of 60 years, and while the policy was in force, furnish proof to the company that she had become totally and permanently disabled by bodily injury or disease, and such disability should exist continuously for 60 days, the company would, during the continuance of such disability, waive the payment of each premium as it thereafter became due, and would, if the disability continued, pay one-tenth of the face amount of the policy annually upon the anniversary of the date of issue; that during the month of July, 1932, she became mentally incompetent, and has ever since that time been, and will continue to be, permanently incapacitated and disabled within the meaning of the provisions of said policy. In supplemental petitions additional annual amounts are prayed for in the sum of $200 each year, so the total recovery sought begins with March 4, 1933, and continues until March 4, 1938, making a total recovery for the six years of $1,200.

Defendant in its amended answer admits the issuance of the policy, and charges that said policy lapsed for non-payment of the premium due on March 4, 1933, and was never reinstated, and the company expressly denies that the insured became or was totally and permanently disabled, as provided in the policy, and such provisions relat-

ing to total and permanent disability were no longer in force and effect. The company denies that the insured, or any one in her behalf, furnished due proof that she was totally and permanently disabled by bodily injury or disease, and denies that there was anything due under the terms of the policy. It is further alleged that any disability that the insured may have suffered was of a temporary nature, and was not of a permanent nature, such as is provided for and contemplated by said policy of insurance.

In the amended reply it was alleged that due notice of plaintiff's disability was furnished the company on behalf of the insured, but that the company denied liability on the ground that the policy had lapsed for failure to pay premiums, and the plaintiff alleges in said amended reply that by so doing the defendant company had waived the furnishing of notice and proof of loss, and is now estopped to deny liability upon the ground of failure to furnish proof.

A jury having been duly impaneled and sworn, trial was had, and all of the evidence taken as found in the bill of exceptions of several hundred pages. When both parties had rested, the defendant moved the court to either direct a verdict in favor of defendant or, in the alternative, to discharge the jury and enter a judgment of dismissal for the following reasons:

"1. The evidence is insufficient to support the allegations of the plaintiff's petition and the reply.

"2. The evidence is insufficient to support a verdict in favor of the plaintiff and against the defendant.

"3. The evidence fails to show that the plaintiff is entitled to recover on his cause of action.

"4. The evidence fails to show that the insured was totally and/or permanently disabled while the policy was in force.

"5. The evidence fails to show that the insured was totally and/or permanently disabled during the time when all past due premiums had been duly paid.

"6. The evidence fails to show that due proof was furnished of any total and permanent disability while the

policy was in force, or within the grace period thereafter, and the evidence is insufficient to excuse the furnishing of said proof. For the further reason the evidence shows that notice and proof were not given until December, 1934, and that the policy lapsed for nonpayment of the premium due March 4, 1933."

After argument the court decided that there was no sufficient evidence about her condition that would warrant a finding, or sustain a finding, for the plaintiff by the jury, and that, if the court submitted the case to the jury and they found for the plaintiff, the court would then have to grant a new trial as a matter of law. The jury were discharged, and the court found for defendant, and directed that it go hence without day.

The plaintiff set out six errors relied upon for reversal. Among them, it is charged that the court erred in finding that the evidence was insufficient to sustain a verdict for the plaintiff, that the insured was not mentally incapacitated during the months of March, April, and May, 1934, and that the court erred in discharging the jury and dismissing plaintiff's petition.

There is very little dispute as to the law governing the case, the solution of the case resting entirely upon the evidence. It is, therefore, necessary to set out the important portions of the evidence.

Exhibit No. 1 was the policy of insurance, dated March 4, 1919, No. 2585882, upon the life of Catherine E. "Gow." In the application for insurance, dated at Omaha March 4, 1919, and attached to the policy received in evidence, it shows that insured was born September 5, 1886, at Lincoln, Nebraska; that her occupation at the time she was insured was saleswoman for the defendant life insurance company; that the premiums were $74.92, due on the 4th day of March until 20 annual premiums have been paid; that a grace of 31 days is granted for the payment of all premiums after the first; that the policy is a participating policy, and that there shall be an annual distribution of surplus at the end of the second and each policy year

thereafter, which may be used in cash, or toward the payment of premiums.

The policy also provides that she shall pay an additional $2.70 a year for total and permanent disability benefits, making a total of $77.62 for the annual premium, and it appears that she paid premiums semiannually.

In the testimony of Carl M. Syvertsen, agency cashier of the defendant company, he states that the last premium was paid on September 3, 1932, which was the premium due September 4, 1932; that it was a semiannual premium of $38.96, and that the next premium, which was due March 4, 1933, has never been paid, although there was a grace period after said date of 31 days allowed by the policy, and in addition thereto a further extension, by reason of the Nebraska bank moratorium, for an additional 31 days. Therefore, the policy lapsed on or about May 5, 1933, and it was so reported to the New York office, in exhibit No. 30, under date of May 20, 1933.

Exhibit No. 26 is a note, signed by the insured, showing that she borrowed $696.90 on this policy on September 30, 1932, although the note was dated back to September 4, as the company requires interest paid from date premium was due. This loan took up an old loan, paid the interest at 6 per cent. and the premium of $38.96 due September 4, 1932.

Now, the next premium was due March 4, 1933, and the cash value of the policy was then $723.14, and a cash dividend was declared of $21.50, making its value $744.64. However, the insured could not have paid the premium by making another new loan, for the old loan with interest thereon would have left a balance of only $26.84 to apply on the premium, leaving $12.12 which the insured would have had to advance in cash to pay the premium, the nonpayment of which lapsed the policy.

Exhibit No. 32 is a letter written the insured at her request, under date of May 26, 1933, telling her how she can surrender policy in suit in case at bar, and how much additional she will have to add to pay the premium on her other policy, being No. 2742206.

The plaintiff alleges.in the petition that during the month of July, 1932, the insured became mentally incompetent, and ever since said time she has been totally and permanently incapacitated.

We will now examine the evidence offered in support of this claim. Mrs. Arthur Blakely, a neighbor, who lived for years across the street from the insured, and who was a practical nurse, had helped out when the insured's mother was sick, and was again engaged as a nurse when the insured had a baby, which lived only about a day, and immediately thereafter she started to have nervous spells and cried a good deal of the time, both night and day. Mrs. Blakely testified that this was entirely different from her conduct prior to that time, for then she had been of a very happy disposition, used to go down town to dinner and be with her friends, and after she had the nervous breakdown she did not want company, and did not want any of her friends around. She states that in 1932 she noticed a change in her manner towards her husband, at a time when she came over to the Colbert apartment and criticized her husband, saying he was irritable and cross. Witness testified that in years prior to that "they got along just perfect," but on this occasion when she visited their apartment she ran through the rooms of their apartment, tore her hair and cried, and said she was going to end her life, and witness tried to get her settled down, but could not do anything with her. This visit occurred in September, 1932. Witness testified that the insured did not come to her home again, but would call her as many as 20 times a day, until they just would not answer the telephone. Sometimes she would just scream into the telephone. She said these telephone calls began in 1929, and got more and more frequent from 1932 up to the day that the insured was taken to the hospital; that the witness went over to the house again on the day they took her to the hospital and gave her two hypodermics under the direction of the doctor. She testified that the insured had been a very fine housekeeper up to about 1932, and that there was a decided change about that

time, and after that she had a very dirty house; the sink would be full of dirty dishes, the beds were not made; that prior to that time the insured dressed very neatly, and beginning in 1932 her clothes were dirty, her skin was dirty, her hair was not combed, and it gradually got worse and worse.

The only medical testimony in this case is that of Dr. G. Alexander Young, a specialist in nervous and mental diseases, and who had been in the practice for 38 years. After graduating from a medical school and serving as house physician and surgeon in the Cook County Hospital, he became assistant physician at the Norfolk State Hospital for the Insane for one year, then served four years at the Lincoln State Hospital for the Insane as assistant superintendent. He then was transferred to Norfolk, and became superintendent of the Norfolk State Asylum, in which capacity he served for two years. He then spent a year and a half abroad in the study of mental diseases, since which time he has practiced as a specialist in nervous and mental diseases in Omaha, taking postgraduate work during that time, both abroad and in this country. Since 1915 he has been the physician for the board of insanity of Douglas county.

He first met the insured on January 12, 1934, when she was brought before the board of insanity in Douglas county upon an information filed against her. He had her under observation from January 13 to March 19, 1934, and testified that she was emotionally very unstable and tense, did not sleep, lost weight, was uncooperative and headstrong. She had paranoid ideas of persecution. During those months he had had her removed from the county hospital to the psychiatric department of the Methodist Hospital, where she could be given better treatment, and where there were proper and excellent facilities for the treatment of her nervous condition. As the result of these months of treatment, he gave as his opinion that she was suffering from depressive psychosis with paranoid trend, which appeared to be due to a glandular deficiency associated with a change of life.

Many objections were made to questions relating to the course of her disease, as learned from the patient and from statements of her relatives, but finally Dr. Young was allowed to answer, and gave his understanding of the history of her case. He said that there had been increasing nervousness, emotional tension which had been developing for three or four years. He testified that when he first treated her she weighed around 140 to 145 pounds; that she has developed obesity, or overweight, until her present weight is around 220 pounds.

Dr. Young testified that at a session of the board of insanity of Douglas county on July 3, 1934, she was found to be insane; that she was kept in the Douglas County Hospital until July 31, 1934, after returning from the Methodist Hospital; that the transcript of proceedings before the board of commissioners of insanity of Douglas county, introduced as exhibit No. 5, shows that the information was filed against her by her husband. It is shown in this transcript that she has become increasingly nervous and seclusive, with occasional bursts of temper, and just before filing the complaint had become violent, unmanageable, screaming, cursing, kicking and biting those who tried to restrain her.

The record shows that she had been married to her husband some 10 or 12 years previously; that he was 20 years older than she was; that when married they were in well-to-do circumstances, but her husband had lost his position and property, and that for two or three years past she had grown increasingly seclusive, refusing to see a physician or to leave the house. The transcript states that she presents an emotional attitude of marked rigidity, is very set in her ideas and self-willed, and takes suggestions poorly.

On cross-examination Dr. Young said that she had been an active and an alert type of woman, with considerable intellectual capacity; that she had been a business woman practically all of her adult life; that she was discharged on March 17, 1934, the transcript of the proceeding in that regard showing: "This patient is suffering from a depressive

psychosis with paranoid features. She should be found insane but I question the advisability of her being committed to the State Hospital. It is possible that she might be able to make a social adjustment either in Grand Island or in California where two sisters reside. I would recommend that she be held under observation for the time being."

On redirect examination it was brought out that Dr. Young had reported on the first occasion that "the patient's condition seems to be one of emotional instability, consequent upon a long continued history of domestic maladjustment and recent financial stress," and that the final conclusion that he reached, when she was brought to him for subsequent observation, was that she was suffering from a true psychosis, which means that it was a definite mental disease.

The husband of the insured, Augustus H. Bewsher, testified on direct examination for some 60 pages. He sometimes failed to answer definite questions, and frequently argued with the court and both attorneys over the form and meaning of his answers, and at the end of the 60 pages of his direct examination, the cross-examination was waived.

To give a synopsis of his evidence would extend this opinion beyond all reasonable length; however, a few of his statements will be presented. He said they were married in the winter of 1923; that his wife had been in charge of the women's department of the defendant company; that they got along nicely until she had a nervous breakdown. He said this was preceded by unusual irritability, she was "picky" on her best friends, would criticize her husband, manifested a violent temper; that in the midsummer of 1932 she seemed to change in many ways, and she would go to bed immediately after dinner, and take sleeping powders; that she would start shouting so that he had to close the windows to keep the neighbors from hearing what was going on; that at the time he thought this was only a temporary ailment; but that it continued; that along about Christmas time in 1932 she would try to kick him out of bed, and did so on one occasion; that she would sleep until about 2 o'clock in the morning, and could not sleep

any more; that she continued to get worse, and finally he had to send her to a hospital; that she had bitten him and her sister-in-law, and was very hard to handle, and he would call up her brother, or nephew, or some one else to help him with her; that prior to March, 1933, he was in the bathroom on one occasion when she broke the panel out of the door to get into the bathroom. The husband in his evidence gives repeated instances of her violence and changed temperament, and mistreatment of neighbors, all of which he testifies was entirely different from her conduct during the former years of their married life.

Toward the end of the husband's testimony, the court decided to ask a few questions, with this result: "By the Court: Q. Now, Mr. Bewsher, you testified this morning that she became very irritable and high-tempered. Well, does she do that now? A. No; she doesn't have the opportunity to. Q. Does she shout at you? A. She never did. Q. Get angry with you? A. She never did. Q. I thought you testified this morning that she did. A. No; I did not; I said she lost her temper, but she never shouted at me. In fact, that man (referring to Mr. Fitch, defendant's attorney) has shouted at me more than any one has in my life."

We have presented at considerable length all of the pertinent evidence bearing on the question of her mental condition, and whether she was totally disabled by reason of insanity on the date the policy lapsed, which was March 4, 1933, as well as during the extension of time of 31 days' grace period allowed in the policy, and an additional extension of time allowed by law because of the bank moratorium in Nebraska.

We will now present a few brief statements from the defendant's evidence. Hale R. Bixby testified he had known the insured since 1927, when he rented from her a house, which he occupied until September, 1932. During all of this time he paid the rent to the insured, negotiated repairs with her, and after he moved out in September, 1932, he continued to make back payments of rent to her, indicating

that she transacted business matters in a satisfactory manner.

Arthur A. Breazeale testified that he rented a place on Douglas street in January, 1929, which was owned by the insured; that she came to see him about some wallpaper for the rooms, and finally arranged to buy the paper and have the renter do the work, and that he lived in her place until October, 1932, and paid her some of the payments of rent; that he had another business transaction with her in reference to some gasoline pumps that were placed in front of the property. When he moved out of the place he said that she was angry at another tenant, but he had no trouble with her, and her condition was "quite rational." On cross-examination he said she walked back and forth, was very much upset, as she was mad at another tenant, whose nickname was Jack and who had a hamburger stand, but insisted that when she came in and talked to him about moving she was all right.

The other tenant referred to, Aden F. Sheil, known as "Jack," testified that he leased some ground from the insured on Douglas street to erect a cement block building in 1930, and he paid her rent from that time up to September, 1933; that sometimes she came to collect it, and sometimes he took it to her place, and she gave him a three-year lease on the ground at $10 a month, and he put up a cement block building, 9 by 12 feet, in which he ran a hamburger stand, and he always paid his rent directly to the insured. He said that when his three-year lease expired he tried to get another three-year lease on the ground, and she tried to raise the rent to about three times what he was paying, which he refused and she became very angry, and as a result of this trouble she had him arrested, and he insisted that they take her along too, and they took both of them down to jail; that he was arrested on the charge that he was tearing down a building on her property, and he told the captain of police about it, and that was all there was to it, and both of them were turned loose.

Francis R. Payne testified that he had known the in-

sured since 1928; that he was in the rental business; that she gave him 5 per cent. for collecting the rent from a certain tenant, and he got a certain tenant for her in the spring of 1933. He was asked, "Did you notice any difference in her appearance and her actions from the time you first met her in 1928 until you last talked to her along in 1933?" and his answer was, "No; I don't know as I noticed a whole lot."

Charles Victor Wilson testified that from February 23, 1925, to March 31, 1936, he was senior clerk in the office of the defendant company in Omaha, and is still working for the company at St. Paul, Minnesota; that he knew the insured because she was a policyholder and wrote insurance policies for the company; that she telephoned him for a loan on her policy, and on April 10, 1933, he wrote her a letter, inclosing a loan note for $734, which was the maximum loan value on the policy at that time, and at the time he wrote her the letter she still had the right to reinstate the policy if she wished to.

It is also disclosed in the evidence that her brother, the plaintiff herein, who is her guardian, took a quitclaim deed from the insured and her husband to himself on April 12, 1934, of her Douglas street property, for the reason that if he made a sale of it he could better handle it as the owner. He never made the contemplated sale, so the deed was never recorded.

An examination of this evidence shows that Catherine G. Bewsher, the insured, became totally and permanently disabled by insanity on July 3, 1934. The testimony of Dr. Young is that, from the history of the case, her increasing nervousness must have been developing for three or four years prior to that date, and there is no question but that she was a nervous woman at the time this policy lapsed for the nonpayment of premium. It is equally clear that after the time the policy lapsed she had been transacting her business, collecting rents, leasing properties, and handling repairs for her property in a very thrifty and businesslike manner.

This question has been before this court many times, and we have held that, when a policy provides generally that when the insured has become wholly and permanently disabled by bodily injury or disease, so that she is and will be permanently, continuously, and wholly prevented thereby from performing any work for compensation or profit, or from following any gainful occupation, it does not mean, as its literal construction would require, a state of complete helplessness; but the total disability contemplated means inability to do all the substantial and material acts necessary to the prosecution of the insured's business or occupation in his customary and usual manner. *Rathbun v. Globe Indemnity Co.*, 107 Neb. 18, 184 N. W. 903; *Oswald v. Equitable Life Assurance Society*, 128 Neb. 173, 258 N. W. 41 ("cow case"); *Hamblin v. Equitable Life Assurance Society*, 124 Neb. 841, 248 N. W. 397; *Hemmer v. Metropolitan Life Ins. Co.*, 131 Neb. 14, 267 N. W. 153; *Woods v. Central States Life Ins. Co.*, 132 Neb. 261, 271 N. W. 850; *Hoover v. Mutual Trust Life Ins. Co.*, 225 Ia. 1034, 282 N. W. 781; *Schultz v. John Hancock Mutual Life Ins. Co.*, 134 Neb. 885, 280 N. W. 165; *Bennett v. Metropolitan Life Ins. Co.*, 136 Neb. 785, 287 N. W. 609; *Miceli v. Equitable Life Assurance Society*, 138 Neb. 374, 294 N. W. 659.

But, in the case at bar, viewing the evidence in the most liberal manner in the light of all our decisions, the plaintiff failed to produce satisfactory evidence that the insured for a period of 60 days before the policy lapsed had been totally and permanently and continuously disabled by mental disease to the extent required by our holdings.

This court held in *Redwelski v. Omaha & C. B. Street R. Co.*, 137 Neb. 681, 290 N. W. 904, that, where the evidence was insufficient to sustain a judgment in favor of the plaintiff, it was the duty of the trial court to sustain a motion directing a verdict for the defendant, and in *Most v. Cedar County*, 126 Neb. 54, 252 N. W. 465, it was held that failure to direct a verdict in favor of the defendant in such a case is reversible error.

We have reached the conclusion that the trial court was

right in discharging the jury and directing that the defendant go hence without day.

AFFIRMED.